UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Syndicaster, LLC,<br><br>                              Plaintiff,<br><br>        - against –<br><br>Nexstar Broadcasting, Inc.<br><br>                              Defendant | No. _____<br><br>**COMPLAINT** |

Plaintiff Syndicaster, LLC ("Syndicaster" or "Plaintiff") by and through its undersigned

counsel, Ellenoff Grossman & Schole LLP, hereby submits this complaint against Defendant

Nexstar Broadcasting, Inc. ("Nexstar" or "Defendant"), and alleges as follows:

## PRELIMINARY STATEMENT

1.      In this action, Plaintiff seeks payment of $1,462,429.39 in fees pursuant to its

agreements with Defendant (as defined herein), which fees Defendant has willfully,

intentionally, and without justification refused to pay despite due demand; Defendant also seeks

recompense for damages to Syndicaster's business caused by Defendant's inexcusable behavior.

In the alternative, Plaintiff also seeks monetary damages based upon unjust enrichment and

*quantum meruit*.

## THE PARTIES

2.      Plaintiff Syndicaster LLC is a domestic Limited Liability Corporation duly

organized and existing under and by virtue of the laws of the State of New York, maintaining a

place of business at 450 Lexington Avenue, New York, NY 10163.

3.      Defendant Nexstar Broadcasting, Inc. is a public corporation duly organized and existing under and by virtue of the laws of the State of Texas, maintaining a place of business at 545 E. John Carpenter Freeway, Suite 700, Irving, Texas 75062.

## JURISDICTION & VENUE

4.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the parties are completely diverse and the amount in controversy exceeds $75,000.

5.      Venue is proper in this District pursuant to the agreements entered into by Plaintiff and Defendant, including the Master Netting Agreement, dated January 16, 2018, (the "Netting Agreement") which provides that "[a]ny action or proceeding, whether legal, equitable, administrative or otherwise, arising out of or relating to this Netting Agreement shall be in the competent court of the United States District Court for the Southern District of New York."

## FACTUAL BACKGROUND

6.      On March 31, 2006, Critical Mention, Inc. ("CM") and Clear Channel Television Interactive, a Division of Clear Channel Broadcasting, Inc. ("Clear Channel", a predecessor to Nexstar) entered into a Preliminary Content License Agreement (the "License Agreement"). The License Agreement provided, among other things, a license under which CM would be able to use certain elements of Clear Channel's copyrighted video content for commercial purposes; it also provided a monthly fee owed to Clear Channel by CM as payment for this license.  A true and correct copy of the Licensing Agreement is annexed hereto as Exhibit A.

7.      On August 3, 2010, CM[1] and Inergize Digital entered into a distribution agreement (the "Distribution Agreement"). The Distribution Agreement provided, among other things, that CM would provide to Inergize Digital's clients CM's end-to-end online video ecosystem.  A true and correct copy of the Distribution Agreement is annexed hereto as Exhibit B.

8.      Upon information and belief, Inergize Digital became part of Nexstar on December 3rd, 2012, as a result of Nexstar's acquisition of ten television stations and two associated digital sub-channels in seven markets, as well as the Inergize Digital e-Media operations from entities controlled by privately-held Newport Television, LLC. At the very least Inergize Digital became part of Nexstar at some point prior to the Second Amendment of the Distribution Agreement, dated February 27, 2014.

9.      On April 26, 2013, CM and Nexstar entered into an agreement whereby Plaintiff agreed to provide certain services, defined as the "Syndicaster Services" (the "Services Agreement"). Per its express terms, the Services Agreement's term began on April 26, 2013 and concluded on June 30, 2017. A true and correct copy of the Services Agreement is annexed hereto as Exhibit C.

10.     The Services Agreement defined the "Syndicaster Services" as "an internet-based system, hosted on servers owned and/or leased and managed by [CM], that enables content providers to upload or capture their Content [as defined in the Services Agreement] . . . and then encode, edit, manage, distribute and monetize such Content directly to end users through various distribution channels."

---

[1] During the relevant time periods, CM did business as "Critical Media, Inc."; CM executed the Distribution Agreement as "Critical Media", but the corporate entity CM was the contracting party opposite Inergize.

11.     Pursuant to the Services Agreement, Defendant owed CM certain monthly fees, including but not limited to fees for Plaintiff's hardware, for Live Streaming and fees for additional users of the Syndicaster Service (the "Monthly Fees"). Per the Services Agreement, the Monthly Fees were billed in advance on the first day of the month.

12.     Also pursuant to the Services Agreement, Defendant owed CM additional fees, the amount of which varied based on Defendant's use of the Syndicaster Services (the "Arrearage Fees", together with the "Monthly Fees", the "Fees"). The Arrearage Fees were billed monthly in arrears, separately from the Monthly Fees, with payment due within thirty days of the invoice.

13.     By agreement dated May 3, 2017, CM and Nexstar, the parties in interest to the Agreements assigned the Agreements to Plaintiff, with the consent of Nexstar (the "Assignment").  A true and correct copy of the Assignment is annexed hereto as Exhibit D.

14.     By the twenty-second (22nd) Amendment to the Services Agreement dated June 15, 2017, the terms of the Services Agreement, the Distribution Agreement, and the License Agreement (collectively, the "Agreements"), were extended to December 31, 2017.  A true and correct copy of the 22nd Amendment is annexed hereto as Exhibit E.

15.     On August 2, 2017, CM sold to Plaintiff the business unit which owned and operated the Syndicaster Services.

16.     After the sale, Plaintiff took over providing the Syndicaster Services to Defendant under the Services Agreement, as well as billing Defendant for the same. During the first several monthly billing cycles following August 2017, upon calculating the Fees owed by Defendant to Plaintiff for the previous month (August 2017 being first month Plaintiff was responsible for

4

billing under the Services Agreement), Plaintiff discovered that Defendant's Fees had *never* been properly calculated or invoiced to Defendant, resulting in significant losses to Plaintiff throughout the course of the Services Agreement.

17.     Immediately prior to Plaintiff's purchase of the Syndicaster Services and for several months after Plaintiff took over the Syndicaster Services, Defendant refused to pay the Fees invoiced by CM and/or Plaintiff including some or all of the Fees for the April, May, August, September October, November and December 2017. These invoiced Fees were never properly disputed by Defendant.

18.     Over the course of its term, the parties (including CM, Plaintiff's predecessor-in-interest) to the Services Agreement amended it twenty-three (23) times, generally for the purpose of extending the term of the Services Agreement and/or adding additional properties. The twenty-third (23rd) Amendment was signed on December 21, 2017 and extended the term of the Services Agreement on a month-to-month basis beginning January 1, 2018, in order to facilitate Defendant's transition away from the Syndicaster Services and onto a new video platform. A true and correct copy of the twenty-third Amendment to the Services Agreement, the last operative Amendment to the Services Agreement, is annexed hereto as Exhibit F.

19.     As part of the parties' ongoing negotiations regarding the Services Agreement, including its twenty-third Amendment, Plaintiff duly demanded payment of the unpaid Fees owed by Defendant. Plaintiff explained to Defendant the erroneous and chronic under-billing of Fees, and offered to provide data to prove its entitlement to these erroneously un-billed Fees.

20.     The parties' discussions regarding the erroneously un-billed Fees culminated on January 16, 2018, when Plaintiff and Defendant entered into the Netting Agreement. The Netting

Agreement's specific and stated purpose was for the parties to come to a settlement as to their net indebtedness to each other pursuant to the License Agreement, Services Agreement, and Distribution Agreement. A true and correct copy of the Netting Agreement is annexed hereto as Exhibit G.

21.     Pursuant to the Netting Agreement, the Parties agreed to: "(a) first calculate the amount of money due as of 12/31/17 from one Party to the other Party as a result of each party's contractual obligations under the Agreements [defined in the Netting Agreement as, collectively, the License Agreement, the Services Agreement, and the Distribution Agreement], then (b) net all undisputed amounts due and owing, and/or past due, arising under the Agreements such that the Party owing the greater amount shall make a single payment of the net amount to the other Party ("Net Settlement")."

22.     The Netting Agreement further provided that "The Net Settlement payment shall be due within thirty days after receipt of an accurate invoice from the Party to be paid. For the avoidance of doubt, any amounts due for services rendered after 12/31/17 shall not be part of this Netting Agreement and shall be invoiced separately under the terms of the applicable Agreements."

23.     From January 2018 through August 2018, Defendant paid all invoices (the "2018 Invoices"), including payment in full for both Monthly Fees and Arrearage Fees.

24.     On September 14, 2018, Defendant provided Plaintiff with a Notice of Termination of the Services Agreement, effective September 30, 2018.

25.     On September 28, 2018, pursuant to the terms of the Netting Agreement, Plaintiff sent Defendant an invoice (the "Net Settlement Invoice") for the Net Settlement, along with

documents and data backing up the invoiced amount. The methodology for the calculations underlying the Net Settlement Invoice were identical to those used for the 2018 Invoices, which Defendant paid on-time and without objection.

26.     By letter dated November 12, 2018, Defendant rejected the Net Settlement Invoice, stating that Plaintiff's "recalculation of the fees owed under such Agreements is not acceptable to [Defendant] and [Defendant does not] accept the accuracy of the fees, or the accuracy of the data used to calculate the fees, stated in the [Net Settlement Invoice]. Therefore, [Defendant] formally disputes the [Net Settlement Invoice] in its entirety." Plaintiff responded that it "viewed the dispute as without merit" because the "dispute" failed even to reference the Netting Agreement and supporting documentation submitted with the Net Settlement Invoice. A true and accurate copy of the November 12, 2018 Correspondence is annexed hereto as Exhibit H.

27.     Notably, despite the obligation to do so under the Netting Agreement, Defendant has not performed its own analysis of the parties' net indebtedness to each other under the Agreements as of December 31, 2017.

28.     To date, Defendant has not paid any of the Net Settlement Amount and has not provided any alternative calculation of the Net Settlement Amount.

29.     In or around December 2018, Defendant acknowledged that *some* amount of money is due under the Netting Agreement but has informed Plaintiff that it did not expect the amount due to be more than $250,000 to $300,000.  To date, Defendant has provided no support for the foregoing figure.

30.     Defendant also informed Plaintiff that the Net Settlement Invoice could not be paid because Defendant is not able to open its books going back to 2013.

31.     In signing the Netting Agreement, Defendant agreed at least to the possibility that a net payment was due and owing to Plaintiff under the Agreements.  Knowing that the Services Agreement's term ran from April 26, 2013 to December 31, 2017, and that it was then extended on a month-to-month basis by the twenty-third Amendment to the Services Agreement, Defendant's execution of the Netting Agreement was an explicit agreement that it may need to open its books going back to 2013 for the purpose calculating the Net Settlement Amount.

### AS AND FOR A FIRST CAUSE OF ACTION
**(Breach of Contract)**

32.      Plaintiff repeats and realleges each and every allegations contained in paragraphs 1 through 31 herein as though fully stated herein.

33.     On or about April 16, 2013, CM and Defendant entered into the Services Agreement, pursuant to which Defendant was required to pay CM for the "Syndicaster Services."

34.     Defendant was required to pay the Fees to CM (and, upon the Services Agreement's assignment, to Plaintiff) throughout the course of the Service Agreement, but has unreasonably refused to pay the full and accurate Fees it owes, despite due demand from Plaintiff.

35.     From April 16, 2013 through December 2017, Defendant failed to pay the Fees in accordance with the Services Agreement.

36.     At all relevant times, Plaintiff provided the Syndicaster Services and performed its obligations under the Services Agreement.

37.    At no time did Plaintiff waive its right to collect the full amount of Fees due from Defendant under the terms of the Services Agreement.

38.    By reason of the foregoing, Plaintiff is entitled to recover from Defendant the amount of $1,462,429.39, together with interest thereon and the costs and disbursements of this action, including Plaintiff's reasonable attorneys' fees.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Breach of Contract)

39.     Plaintiff repeats and realleges each and every allegations contained in paragraphs 1 through 38 herein as though fully stated herein.

40.    On or about January 16, 2018, Plaintiff and Defendant entered into the Netting Agreement.

41.    The Netting Agreement provided that the Parties would: "(a) first calculate the amount of money due as of 12/31/17 from one Party to the other Party as a result of each party's contractual obligations under the Agreements, then (b) net all undisputed amounts due and owing, and/or past due, arising under the Agreements such that the Party owing the greater amount shall make a single payment of the net amount to the other Party ("Net Settlement")."

42.    The Netting Agreement further provided that "The Net Settlement payment shall be due within thirty days after receipt of an accurate invoice from the Party to be paid."

43.    Pursuant to the Netting Agreement, Plaintiff submitted the Net Settlement Invoice on or about September 28, 2018.

44.     Pursuant to the Netting Agreement, Plaintiff submitted the Net Settlement Invoice on or about September 28, 2018, along with documents and data backing up the calculation of the Net Settlement Invoice amount.

45.     Defendant failed to pay or dispute the Net Settlement Invoice within 30 days, as required under the Netting Agreement.  Defendant further failed to perform its own calculation or engage in discussions as to the proper Net Settlement amount, as required under the Netting Agreement.

46.     Defendant's (belated) notice that it "disputes the [Net Settlement Invoice] in its entirety" was ineffectual, in that it failed to provide an adequate explanation of the dispute and/or failed to provide an alternative calculation supporting its contention.

47.     As a result of Defendant's bad faith, unreasonable, knowing and willful violation of the Netting Agreement in refusing to pay the Net Settlement Invoice, Plaintiff has suffered additional damages by virtue of lacking working capital with which to pursue lucrative business opportunities.  Plaintiff suffered these damages in an amount to be determined at trial, but estimated to be at least $5 million.

48.     By reason of the foregoing, Plaintiff is entitled to recover from Defendant the amount of $1,462,429.39, together with interest thereon from October 28, 2018; consequential damages of $5 million, and the costs and disbursements of this action, including reasonable attorneys' fees.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Account Stated)

49.     Plaintiff repeats and realleges each and every allegations contained in paragraphs 1 through 48 herein as though fully stated herein.

50.     The Netting Agreement provided that "The Net Settlement payment shall be due within thirty days after receipt of an accurate invoice from the Party to be paid."

51.     Plaintiff submitted the Net Settlement Invoice on or about September 28, 2018, along with documents and data backing up the calculations on which the Net Settlement Invoice amount was based.

52.     Defendant refused to pay or dispute the Net Settlement Invoice within 30 days, as required under the Netting Agreement.  Defendant further refused to perform its own calculation or engage in discussions as to the proper Net Settlement amount, as required under the Netting Agreement.

53.     Defendant's (belated) notice that it "disputes the [Net Settlement Invoice] in its entirety" was ineffectual, in that it failed to provide an adequate explanation of the dispute and/or failed to provide an alternative calculation supporting its contention.

54.     By reason of the foregoing, Plaintiff is entitled to recover from Defendant the amount of $1,462,429.39, together with interest thereon from October 28, 2018, and the costs and disbursements of this action, including reasonable attorneys' fees.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Quantum Meruit)

55.      Plaintiff repeats and realleges each and every allegations contained in paragraphs 1 through 54 herein as though fully stated herein.

56.     The fair and reasonable value of the Syndicaster Services provided by Plaintiff to Defendant, net of the value Plaintiff received from Defendant pursuant to the License Agreement, is $1,462,429.39.

57.     Defendant has been unjustly enriched by virtue of its failure to pay for the Syndicaster Services, despite having received them.

58.     By reason of the foregoing, Plaintiff is entitled to recover from Defendant the amount of $1,462,429.39, together with interest thereon and the costs and disbursements of this action, including reasonable attorneys' fees.

### AS AND FOR A FIFTH CAUSE OF ACTION
**(Unjust Enrichment)**

59.      Plaintiff repeats and realleges each and every allegations contained in paragraphs 1 through 58 herein as though fully stated herein.

60.     The fair and reasonable value of the Syndicaster Services provided by Plaintiff to Defendant, net of the value Plaintiff received from Defendant pursuant to the License Agreement, is $1,462,429.39.

61.     Defendant has been unjustly enriched by virtue of its failure to pay for the Syndicaster Services, despite having received them.

62.     Having received the Syndicaster Services, but having failed to pay the net value thereof, it would inequitable and unjust for Defendant to retain the value of the Syndicaster Services without paying for such net value.

63.     By reason of the foregoing, Defendant has been unjustly enriched, to the detriment of Plaintiff, in the amount of $1,462,429.39, together with interest thereon, and the costs and disbursements of this action, including reasonable attorneys' fees.

## AS AND FOR A SIXTH CAUSE OF ACTION
### (Accounting)

64.     Plaintiff repeats and realleges each and every allegations contained in paragraphs 1 through 63 herein as though fully stated herein.

65.     On or about January 16, 2018, Plaintiff and Defendant entered into the Netting Agreement.

66.     The Netting Agreement provided that the Parties would: "(a) first calculate the amount of money due as of 12/31/17 from one Party to the other Party as a result of each party's contractual obligations under the Agreements, then (b) net all undisputed amounts due and owing, and/or past due, arising under the Agreements such that the Party owing the greater amount shall make a single payment of the net amount to the other Party ("Net Settlement")."

67.     Plaintiff provided Defendant with its calculation of the Net Settlement pursuant to the terms of the Netting Agreement.

68.     Defendant rejected Plaintiff's calculation but failed to provide its own calculation of the Net Settlement Amount, as required under the Netting Agreement.

69.     To the extent that Defendant disputes the Net Settlement Invoice and/or its underlying data, Defendant is required to provide its own accounting of the Net Settlement Amount.

**WHEREFORE**, Plaintiff requests entry of a judgment against Defendants as follows:

A. On its First Cause of Action, monetary damages against Defendant in amount to be determined at trial, but in no event less than $1,462,429.39;

B. On its Second Cause of Action, monetary damages against Defendant in amount to be determined at trial, but in no event less than $6,462,429.39;

C. On its Third Cause of Action, monetary damages against Defendant in amount to be determined at trial, but in no event less than $1,462,429.39;

D. On its Fourth Cause of Action, monetary damages against Defendant in amount to be determined at trial, but in no event less than $1,462,429.39;

E. On its Fifth Cause of Action, monetary damages against Defendant in amount to be determined at trial, but in no event less than $1,462,429.39;

F. On its Sixth Cause of Action, an accounting of the Net Settlement Amount under the Netting Agreement;

G. On all Causes of Action, awarding Plaintiff such other relief as this Court may deem just and proper.

Dated: New York, NY
        April 26, 2019

ELLENOFF GROSSMAN & SCHOLE LLP
*Attorneys for Plaintiff*

By: _____
      John B. Horgan
      Joanna R. Cohen
1345 Avenue of the Americas, 11th Floor
New York, NY 10105
(212) 370-1300

14

VERIFICATION

STATE OF NEW YORK        )
                         )   ss.:
COUNTY OF NEW YORK       )

Ion Puspurica, being duly sworn, deposes and says:

I am the General Manager of Syndicaster, LLC. the plaintiff herein. I have read the foregoing Verified Complaint and the same is true to my own knowledge, except as to matters stated on information and belief, and as to those matters, I believe them to be true.  This verification is made by me because I am the individual plaintiff herein.

_____
Ion Puspurica

Sworn to before me this

**26**th day of April, 2019

_____
Notary Public

**FAWN LEE**
**NOTARY PUBLIC-STATE OF NEW YORK**
**No. 02LE6329528**
**Qualified in Queens County**
**My Commission Expires August 24, 2019**